SHEPHERD CONSTRUCTION CO., INC., PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 4585-66. Filed March 3, 1969.

*Walter Akerman, Jr.*, for the petitioner.
*Thomas F. Niles*, for the respondent.

DAWSON, *Judge:* Respondent determined deficiencies in income tax for the fiscal years ended on March 31, 1961 and 1962, in the amounts of $62,880.73 and $29,601.05, respectively. Certain minor adjustments for fiscal year 1962 relating to entertainment and sales promotion expenses and to depreciation have not been contested. The issues for decision are (1) whether petitioner, an accrual basis contractor engaged in highway construction, is entitled to deductions for amounts of "retainage" withheld from its subcontractors prior to final acceptance and approval of the work performed, and, if not, (2) whether, under the provisions of section 481 of the Internal Revenue Code of 1954,[1] respondent's adjustment of petitioner's taxable income for the taxable year ended March 31, 1961, was proper.

---

[1] All section references herein are to the Internal Revenue Code of 1954 unless otherwise indicated.

### FINDINGS OF FACT

Some of the facts have been stipulated by the parties. The stipulation of facts and exhibits attached thereto are incorporated herein by this reference.

Petitioner is a corporation chartered under the laws of the State of Georgia in 1949. Its principal office and place of business is and has been at all times in Atlanta, Ga. Its books and records are kept and its Federal tax returns are prepared on an accrual method of accounting and for fiscal years ended on March 31. Its Federal income tax returns for the taxable years ended in 1961 and 1962 were filed with the district director of internal revenue at Atlanta, Ga.

The petitioner is principally engaged in the highway construction business and dealt primarily with governmental agencies during the years in question and the years immediately prior and subsequent thereto. With respect to the issues presented in this case, all of petitioner's income during the taxable years was received from the Highway Department of the State of Georgia (hereinafter referred to as the highway department).

Petitioner usually functions as a "prime" or general contractor and so acted during the years in issue. A prime contract sometimes requires 4 to 5 years to complete. A portion of the work called for by the prime contract was normally performed by the petitioner, including clearing, grading, paving, and pipe or cross-drainage structures exclusive of box culvert-type construction. Petitioner entered into separate contracts with various subcontractors for the performance of the remainder of the work, such as base and subbase work, concrete box culverts, bridges, concrete paving, masonry and brick work, guard rails, grassing, and certain other special items such as stripe painting, signs, and lighting. The contractor, petitioner herein, acting directly or through its agents, is responsible for the fulfillment of all of the terms of the contract and for the payment of all legal debts pertaining to the work.

"Standard Specifications" for the "Construction of Roads and Bridges," prescribed by the highway department and issued from time to time in the form of bound handbooks, are made a part of the highway department contracts, and were made a part of all contracts which petitioner had with the highway department during the years in issue.[2] Any amendments, modifications, or revisions made between periodic issues of the bound handbooks are specifically set forth in the highway department contracts. The "Standard Specifications," insofar as they are pertinent to the issues presented herein, are as follows:

---

[2] Specific contracts between the highway department and petitioner in effect during the taxable years were not placed in evidence, apparently because of their bulk.

4.01. INTENT OF PLANS AND SPECIFICATIONS: The intent of the Plans, Specifications and Special Provisions is to prescribe a work or improvement which the Contractor undertakes to do, complete in every detail, in accordance with the Contract. The Contractor shall perform all items of The Work set forth in the Proposal and in the Plans, shall remove all obstructions from the highway and shall do such Extra Work as the Engineer may consider necessary to complete the Project to the finished lines, grades, cross-sections and other dimensions specified, in a satisfactory manner. He shall furnish, unless otherwise provided in the Contract, all the material, implements, machinery, equipment, tools, supplies, transportation, labor and supervision necessary for the prosecution and completion of The Work.

5.01. AUTHORITY AND DUTIES OF ENGINEER: The Work shall be done under the supervision of the Engineer.

a. Engineer's Decision and Estimates Final: The Engineer will decide promptly all questions related to the quality and acceptability of materials furnished, work performed, and as to the manner of performance and rate of progress of The Work. His decision shall be final on all questions related to the interpretation of the Specifications and the Plans and as to the acceptable fulfillment of the Contract by the Contractor. The Engineer will determine the qualities of the several kinds of work performed and materials furnished which are to be paid for under the Contract and his estimate shall be final, and *the Contractor shall not have a right to receive any money due under the Contract until the Engineer's estimate has been made*; provided, however, that any decision of the Engineer regarding contractual questions as distinguished from technical questions may be appealed to the Board by the Contractor.

5.08. INSPECTION: The Contractor shall furnish the Engineer every reasonable means of ascertaining whether or not The Work as performed and the materials used are in accordance with the Specifications and Contract. If the Engineer requires it, the Contractor shall remove or uncover such portions of the finished Work as may be directed. After examination, the Contractor shall restore said portions of The Work to the standard required by the Specifications. Should work thus exposed or examined prove acceptable, the uncovering, or removing, and the replacing of the covering and making good of the parts removed will be paid for as Extra Work but *should the work so exposed or examined prove unacceptable, the uncovering and removing, and the replacing of the covering and making good of the parts removed, shall be done at the Contractor's expense.*

a. Inspection Always Required: No work shall be done nor materials used without suitable supervision and inspection by the Engineer or his representative. Failure to reject defective work or material shall not prevent later rejection when the defect is discovered, nor shall it oblige the Engineer to accept the defective work.

\*     \*     \*     \*     \*     \*     \*

5.09. REMOVAL OF DEFECTIVE AND UNAUTHORIZED WORK:

a. Work Rejected or Done Outside Lines: All work which has been rejected shall be remedied or removed and acceptably replaced by the Contractor, and no payment will be made for the removal and replacement. Work done outside the lines and grades given or shown on the Plans, unless it is authorized by the Engineer, and all Extra Work done without written authority will be considered unauthorized and done at the expense of the Contractor, and no payment will be made for it. *Work so done may be ordered removed at the Contractor's expense.*

\*     \*     \*     \*     \*     \*     \*

c. *Failure to Comply: Should the Contractor fail to comply promptly with any order made by the Engineer as above provided, the Engineer shall have authority*

*to cause the defective work to be remedied or removed and replaced, and the unauthorized work to be removed; and to deduct the cost of any such remedy, removal or replacement from any monies due or to become due to the Contractor. If no such monies are available, the amount will be charged against the Contractor's Surety.*

\*     \*     \*     \*     \*     \*     \*

5.13. FINAL CONSTRUCTION INSPECTION: Whenever the Engineer considers The Work provided by the Contract is nearing completion, or within 10 days after he is notified by the Contractor that The Work is completed, the Engineer will inspect The Work. If the Engineer finds that it has not all been satisfactorily completed when it is inspected, he shall advise the Contractor in writing as to the work to be done and the defects to be remedied to make The Work ready for Final Construction Inspection. After all the items of The Work required under the Contract, as modified by Work Orders or Supplemental Agreements have been satisfactorily completed, the Engineer shall make the Final Construction Inspection.

5.14. *FINAL ACCEPTANCE: When, upon the completion of the Final Construction Inspection, The Work is found to conform to the Plans and all Specifications, Change Orders, Extra Work Orders and Supplemental Agreements, the Engineer will give the Contractor written notice of Final Acceptance and the Engineer's representative assigned to The Work will notify the Engineer in writing that The Work has been completed and certify the amount of each item of work performed and the payments due the Contractor.*

\*     \*     \*     \*     \*     \*     \*

9.07. PARTIAL PAYMENTS: Once each month the Engineer will make an approximate estimate, on the regular form of the Department, of the Pay Items complete in place and the value thereof according to the Contract unit prices.

a. *Deductions: From the amount so determined, the Department will deduct and withhold 10 per cent,* and these deductions will be continued until the value of the work done is equal to or more than one half the estimated value of all The Work to be done under the Contract, and the amounts so deducted will be retained by the Department until all of The Work has been finally accepted. The entire amount so withheld, which will then be at least 5 percent of the estimated value of all The Work to be done, will be retained by the Department until all of The Work has been finally accepted. If the progress of the work is satisfactory, the deductions thus far made (10 per cent of one half of the value of all The Work to be done), will be the last deductions made until all of The Work has been finally accepted, except those provided for in paragraphs d, e and f below.

b. Payment of Balance: The balance remaining after all deductions provided for in this Article have been made, will be paid to the Contractor.

\*     \*     \*     \*     \*     \*     \*

f. Estimates Approximate: The estimates here provided for are approximate and are subject to correction in the final estimate and payment.

\*     \*     \*     \*     \*     \*     \*

9.08. ACCEPTANCE AND FINAL PAYMENT: Final acceptance is stipulated to mean written final acceptance by the State Highway Engineer, followed by final payment in accordance with the Engineer's final statement. Whenever, in the opinion of the Engineer, the Contractor shall have completed The Work in an acceptable manner and in accordance with the terms of the Contract, he shall certify to the Treasurer of the State Highway Department in writing as to said completion, and shall further certify as to the entire amount of every class of work performed and as to the value thereof. The Treasurer, upon receipt of said certificate, shall in turn furnish the Contractor with the Standard Release Form

to be executed in duplicate. Upon receipt of said release, properly executed, the Treasurer shall make final payment jointly to the Contractor and his Surety. The aforesaid certificate, release and final payment shall be evidence of the action of the Board and the Engineer by which the Contractor is bound according to the terms of the Contract; all prior certificates, releases, or estimates upon which payments may have been made being merely partial estimates and subject to correction in the final payment.

[Emphasis supplied.]

In accordance with the standard specifications, the State highway engineer made during the taxable years monthly estimates of the value of pay items complete in place according to the contract unit prices with respect to work in progress under highway department contracts, including its contracts with petitioner. The highway department made partial payments under its contracts with petitioner during the taxable years based upon the highway engineer's monthly estimates and retained 10 percent of each such partial payment until the contract involved became 50-percent completed, after which all subsequent partial payments under the contract were made without retainage of any additional amounts. With each succeeding partial payment after a contract became 50-percent completed the percentage comprising the ratio of the retainage to the total price of the completed work under the prime contract declined so that when the petitioner's contracts became 100-percent completed the retainage withheld by the highway department constituted only 5 percent of the total prime-contract price.

During the years in issue, petitioner entered into both oral and written contracts with its subcontractors. The oral subcontracts resulted primarily from the fact that petitioner continued to obtain prices for the subcontracted work until an hour or so before its bid for the prime contract was submitted. Some of the oral contracts were confirmed by letter or were reduced to writing and signed by the parties. The terms of the various contracts were not uniform. In general, however, the subcontractors agreed to perform specific portions of the prime contracts in accordance with the plans and specifications of the highway department. Partial payments were to be made to the subcontractors based upon the pay items in place, as determined by the highway engineers' monthly estimates of satisfactorily completed work on the prime contract, which were attributable to the individual subcontractors. It was understood that a retainage would be withheld from the partial payments in the same proportion as the retainage withheld by the highway department from petitioner on the prime contract. Final payment for completed work was to be made when petitioner received payment of the retainage withheld by the highway department for such work.

In a standard-form written contract sometimes used by petitioner, the petitioner was expressly given the right in the event of breach by a subcontractor to set off the retainage withheld from partial payments to the subcontractor against the cost of completing the subcontract work.

In practice, petitioner made partial payments to the subcontractor promptly after receiving partial payment from the highway department on the prime contract. Retainages on all the subcontracts were withheld but were in some cases paid over to subcontractors before petitioner received final payment from the highway department. The subcontractors sometimes assigned to others their rights to receive the retainages withheld by petitioner. In such case, petitioner was notified so that direct payment could be made by it to the assignees. Petitioner has never had any work performed by a subcontractor which, having been approved for partial payment on an engineer's monthly estimate, subsequently failed to pass final inspection. On one prime contract, petitioner was required to pay a penalty of $1,400 because it required 7 more days to complete the contract than specified. No reductions were made by petitioner in its final payments to subcontractors as a result of the penalty.

Prime contractors, including petitioner, were during the taxable years required to file written application for and obtain approval from the highway department before employing each subcontractor to perform work required under a highway department contract, and the highway engineer's monthly estimates were available to subcontractors. For the ones able to do so, petitioner required its subcontractors to supply a 100-percent performance bond.

During the taxable years in issue and during all taxable years prior thereto, petitioner accrued on its books and deducted on its Federal income tax returns the amounts withheld from subcontractors for work performed by them, the payment of which was delayed pending receipt by petitioner from the highway department of retainage relating to such work. The balances of such accrued amounts at the end of each of the taxable years ended March 31, 1953, through March 31, 1963, were as follows:

| As of Mar. 31— | Accrued amount | As of Mar. 31— | Accrued amount |
|---|---|---|---|
| 1953 | [1] $2, 871. 05 | 1959 | $87, 562. 73 |
| 1954 | None accrued | 1960 | 101, 869. 35 |
| 1955 | 6, 226. 37 | 1961 | 126, 813. 49 |
| 1956 | 3, 859. 77 | 1962 | [2] 197, 663. 66 |
| 1957 | [1] 34, 717. 74 | 1963 | 348, 535. 66 |
| 1958 | 45, 062. 40 | | |

[1] Includes additional estimated amounts payable to subcontractors not related to retainage receivable from the highway department.

[2] In the computation attached to the notice of deficiency respondent used the figure $197,663.86 as the "Balance in 'Subcontractors' retainage' account on March 31, 1962."

Petitioner's gross receipts, cost of goods sold, and subcontract expense, which was shown as a part of cost of sales, were reported on its Federal income tax returns for the fiscal years ended March 31, 1961 and 1962, as follows:

|  | 1961 | 1962 |
|---|---|---|
| Gross receipts | $2, 917, 976. 74 | $4, 394, 363. 59 |
| Cost of goods sold | 2, 710, 417. 74 | 4, 292, 735. 49 |
| Subcontract expense | 1, 357, 324. 86 | 1, 852, 540. 62 |

Petitioner does not report as income on its Federal income tax returns amounts withheld from it by the highway department as retainage until the work to which such retainage relates has been completed and finally inspected and approved by the highway department.

About 30 to 40 percent of the retainage withheld by the highway department is equal in amount to the retainage withheld by petitioner from its subcontractors.

The balance of $101,869.35 subcontractors' retainage as of April 1, 1960, represents subcontractors' retainage accrued and unpaid by petitioner as of that date pending final inspection and final approval by the highway department but deducted by petitioner on its Federal income tax returns during taxable years prior to such date.

In the statutory notice of deficiency the respondent determined that the increases in the "subcontractors' retainage" account in the taxable years ended March 31, 1961, and March 31, 1962, in the amounts of $24,944.14 and $70,850.37 were not allowable deductions and increased the petitioner's income accordingly. In addition, he included the $101,869.35 balance in the "subcontractors' retainage" account as of April 1, 1960, in petitioner's taxable income for the taxable year ended March 31, 1961, as an adjustment under section 481. A 3-year allocation of the adjustment in determining its tax effect was made under section 481(b)(1).

### OPINION

Our decision requires a determination of the proper time, under petitioner's accrual method of accounting, for the deduction of a business expense which is concededly ordinary and necessary. Both parties agree that this determination ultimately depends upon a proper application of the "all events" test established in *United States* v. *Anderson*, 269 U.S. 422 (1926),[3] and incorporated into section 1.461–1(a)(2), Income Tax Regs.[4]

[3] "In advance of the assessment of a tax, all the events may occur which fix the amount of the tax and determine the liability of the taxpayer to pay it." (p. 441)
[4] Sec. 1.461–1 General rule for taxable year of deduction.
(a) General rule— * * *
(2) Taxpayer using an accrual method. Under an accrual method of accounting, an expense is deductible for the taxable year in which all the events have occurred which

Petitioner argues that its liability to compensate its contractors in full, notwithstanding the retainages withheld from payments to them, for work which they satisfactorily performed was fixed, and determinable in amount with reasonable accuracy, at the time the subcontractors' work was approved in the highway engineers' monthly estimates. To the contrary, respondent contends that petitioner was not legally obligated to pay the retainage to the subcontractors until the prime contract was completed, finally inspected, and finally approved and petitioner had received the retainage withheld by the highway department.

The liabilities between petitioner and the highway department on the prime contracts were carefully and uniformly stated according to the "Standard Specifications." Under these contracts petitioner was entitled to partial payments measured by the engineers' monthly estimates of the value of pay items complete in place less a 10-percent retainage (which was subject to suspension after the contracts were 50-percent completed). It had no right to additional payment until final inspection and acceptance of the entire work under the contract and then only if the cost of removal of defective or unauthorized work did not exceed the total retainage. In such case we have no doubt that "all events" fixing the liability of the highway department to pay over to petitioner some portion of the retainage had not occurred until the time of the final accounting. Petitioner delayed accrual of these retainages as income until such time, a practice which respondent has not questioned in this proceeding.

Petitioner's agreements with its subcontractors were both oral and written and were not uniform in their provisions. Under all, however, petitioner withheld retainage from partial payments to the subcontractors in the same proportion as the retainage withheld by the highway department. In addition, it was clearly understood that all work under the subcontracts would be performed in accordance with the specifications and plans as set out in the prime contracts. In the standard-form written subcontract sometimes used, petitioner was given the same rights with respect to satisfaction of claims out of the retainage as the highway department was given in the prime contracts. We conclude that petitioner possessed similar rights under all its subcontracts through an express understanding or an implied condition.

determine the fact of the liability and the amount thereof can be determined with reasonable accuracy. However, any expenditure which results in the creation of an asset having a useful life which extends substantially beyond the close of the taxable year may not be deductible, or may be deductible only in part, for the taxable year in which incurred. While no accrual shall be made in any case in which all of the events have not occurred which fix the liability, the fact that the exact amount of the liability which has been incurred cannot be determined will not prevent the accrual within the taxable year of such part thereof as can be computed with reasonable accuracy. * * *

It appears from this record that petitioner generally completed its work under the prime contracts efficiently and according to specifications. Only one instance was alluded to in which petitioner was required to pay a penalty on a prime contract. We do not draw from the fact that petitioner did not reduce its final payment to any subcontractor in this instance, the conclusion that it could not have done so had the delay in performance been occasioned by a subcontractor or that it would not have the legal right to do so in future instances.

Section 446(b) gives respondent the broad discretion to compute taxable income under a method of accounting which, in his opinion, clearly reflects income. See *Lucas* v. *American Code Co.*, 280 U.S. 445 (1930). We cannot say that respondent has abused his discretion when, on this record, we discern no significant differences in the terms of payment under the prime contracts and the subcontracts sufficient to justify petitioner's inconsistent treatment of retainages provided for under the two types of contracts. The consequence of the exclusion from income on the one hand and the inclusion of an expense on the other was a distortion of petitioner's annual profits. See and compare *Wright Contracting Co.*, 36 T.C. 620 (1961), affd. 316 F. 2d 249 (C.A. 5, 1963), certiorari denied 375 U.S. 879; *Ohmer Register Co.* v. *Commissioner*, 131 F. 2d 682 (C.A. 6, 1942).

At the time of the partial payments to its subcontractors, all events had not occurred which rendered petitioner's obligation to pay some amount of the retainage to them fixed and certain. *Peoples Bank & Trust Co.*, 50 T.C. 750 (1968); *Oberman Manufacturing Co.*, 47 T.C. 471 (1967). We hold that petitioner improperly accrued the retainage as an expense at that time.

Our holding on the first issue raises the additional question whether respondent made a proper adjustment under section 481. The prerequisite to the application of section 481 is a finding that there has been a change in a "method of accounting." [5] For the purposes of this section, as well as for the complementary provisions of section 446, "method of accounting" means the consistent treatment of a recurring, material item, whether that treatment be correct or incorrect. *Peoples Bank & Trust Co., supra; Dearborn Gage Co.*, 48 T.C. 190 (1967);

---

[5] SEC. 481. ADJUSTMENTS REQUIRED BY CHANGES IN METHOD OF ACCOUNTING.

(a) GENERAL RULE.—In computing the taxpayer's taxable income for any taxable year (referred to in this section as the "year of the change")—

(1) if such computation is under a method of accounting different from the method under which the taxpayer's taxable income for the preceding taxable year was computed, then

(2) there shall be taken into account those adjustments which are determined to be necessary solely by reason of the change in order to prevent amounts from being duplicated or omitted, except there shall not be taken into account any adjustment in respect of any taxable year to which this section does not apply unless the adjustment is attributable to a change in the method of accounting initiated by the taxpayer.

*Oberman Manufacturing Co.*, *supra; Hulond R. Ryan*, 42 T.C. 386 (1964) ; *Fruehauf Trailer Co.*, 42 T.C. 83 (1964), affd. 356 F. 2d 975 (C.A. 6, 1966), certiorari denied 385 U.S. 822.

The retainage herein was a recurring item which was consistently accrued by petitioner as an expense in the year withheld from payments made to subcontractors. During the years in issue the retainage balance averaged approximately $150,000 with a yearly increment of about $50,000. Clearly the retainage constituted a material item. We find that the change in the treatment of retainage initiated by respondent was a change in petitioner's "method of accounting."

A total retainage of $101,869.35 was improperly accrued and deducted by petitioner in years barred by the statute of limitations (petitioner's taxable year ended March 31, 1960, and years prior thereto). Under its new method of accounting, this entire amount will be properly accruable in years 1961 and thereafter upon final inspection and acceptance of the prime contracts. Section 481 was enacted for the express purpose of allowing in the year of change an adjustment of just such an amount, whether that amount relates to gross income or deduction, "in order to prevent amounts from being duplicated or omitted." *Dearborn Gage Co.*, *supra;* S. Rept. No. 1622, to accompany H.R. 8300 (Pub. L. No. 591), 83d Cong., 2d Sess., p. 307.

Since respondent initiated the change in petitioner's method of accounting, no adjustment may be made for the balance of improperly accrued expenses ($2,871.05) existing in years prior to 1954. Sec. 481(a)(2) ; see *Peoples Bank & Trust Co.*, *supra; Oberman Manufacturing Co.*, *supra; Fruehauf Trailer Co.*, *supra.* Therefore, we hold that respondent's adjustment under section 481 was proper to the extent of $98,998.30.

Reviewed by the Court.

*Decision will be entered under Rule 50.*

---

BRUCE, *J.*, dissenting: I agree with the majority opinion regarding the first issue, but strongly disagree with the conclusions and opinion of the majority respecting the application of section 481 for the reasons: (1) That the disallowance of the deduction for subcontractors' retainage for the taxable year ended in 1961 did not, in my opinion, constitute "a change in method of accounting" within the meaning of section 481; and (2) that the inclusion of $101,869.35, the balance in the subcontractors' retainage account as of the end of the preceding taxable year, in petitioner's income for the taxable year ended in 1961 is clearly not "necessary" "in order to prevent amounts from being duplicated or omitted," as required by section 481. Consequently, section 481 is not applicable.

It having been determined that petitioner is not entitled to a deduction for the taxable year ended March 31, 1961, for the amount of "subcontractors' retainage" withheld from its subcontractors in the taxable year ended March 31, 1961, it becomes necessary to determine whether, under the provisions of section 481, petitioner's taxable income for the taxable year ended March 31, 1961, is to be increased by the balance, as of April 1, 1960, of "subcontractors' retainage" deducted in preceding taxable years.

In the statement attached to the notice of deficiency, respondent explained the increase in petitioner's taxable year for the taxable year ended March 31, 1961, in the amount of $101,869.35, as follows:

It is determined that adjustment (a) above constitutes a change in method of accounting for a material item and that the provisions of section 481 of the Internal Revenue Code of 1954 apply to the balance of "subcontractors retainage" as of April 1, 1960. Accordingly, taxable income is increased by this balance of $101,869.35.

Section 481 provides, in pertinent part, as follows:

SEC. 481. ADJUSTMENTS REQUIRED BY CHANGES IN METHOD OF ACCOUNTING.

(a) GENERAL RULE.—In computing the taxpayer's taxable income for any taxable year (referred to in this section as the "year of the change")—

(1) if such computation is under a method of accounting different from the method under which the taxpayer's taxable income for the preceding taxable year was computed, then

(2) there shall be taken into account those adjustments which are determined to be necessary solely by reason of the change in order to prevent amounts from being duplicated or omitted, except there shall not be taken into account any adjustment in respect of any taxable year to which this section does not apply unless the adjustment is attributable to a change in the method of accounting initiated by the taxpayer.

(b) LIMITATION ON TAX WHERE ADJUSTMENTS ARE SUBSTANTIAL.—

(1) THREE YEAR ALLOCATION.—If—

(A) the method of accounting from which the change is made was used by the taxpayer in computing his taxable income for the 2 taxable years preceding the year of the change, and

(B) the increase in taxable income for the year of the change which results solely by reason of the adjustments required by subsection (a)(2), other than the amount of such adjustments to which paragraph (4) or (5) applies, exceeds $3,000,

then the tax under this chapter attributable to such increase in taxable income shall not be greater than the aggregate increase in the taxes under this chapter (or under the corresponding provisions of prior revenue laws) which would result if one-third of such increase in taxable income were included in taxable income for the year of the change and one-third of such increase were included for each of the 2 preceding taxable years.

For purposes of clarification, it should first be pointed out: (1) That although respondent is barred by limitations from determining "de-

ficiencies" in income tax for any of the years prior to the taxable year ended in 1961, section 481 authorizes adjustment to tax to be made "in the year of change" with respect to amounts omitted or duplicated in closed years, if "necessary solely by reason of the change in order to prevent amounts from being duplicated or omitted" (*Hulond R. Ryan*, 42 T.C. 386, 396 (1964); *Graff Chevrolet Co. v. Campbell*, 343 F. 2d 568 (C.A. 5, 1965)); (2) the change in method of accounting in the taxable year ended in 1961, if there was one, was initiated by respondent and applied to deductions and not income; and (3), if section 481 is applicable, petitioner has not questioned the correctness of respondent's computation.

Petitioner's principal contention with respect to this issue is that section 481 is not applicable for the reason that there has been no change in method of accounting.

Respondent agrees that petitioner has regularly kept its accounts and reported its income on an overall accrual method of accounting and still does. He contends, however, that the "adjustment" of petitioner's taxable income for the taxable year ended March 31, 1961, resulting from his disallowance of a deduction for subcontractors' retainage, "constitutes a change in accounting method for a material or significant item" and requires that the balance in petitioner's subcontractors' retainage account on April 1, 1960, in the amount of $101,869.35, be included in the taxable year ended March 31, 1961, and taxed in accordance with section 481(b)(1). I do not agree.

In the first place, the disallowance of the deduction for subcontractors' retainage for the taxable year ended in 1961 did not involve any *change* in *method of accounting*, such as is contemplated by section 481, but resulted solely from respondent's determination (with which I have agreed) that the amount in question was not in fact *accruable* in the taxable year simply because the liability and amount thereof had not become fixed and certain and accordingly was not properly deductible under the accrual method of accounting employed by the petitioner in keeping its books and reporting its taxable income.

Section 446,[1] the "General Rule for Methods of Accounting," pro-

---

[1] SEC. 446. GENERAL RULE FOR METHODS OF ACCOUNTING.

(a) GENERAL RULE.—Taxable income shall be computed under the method of accounting on the basis of which the taxpayer regularly computes his income in keeping his books.

(b) EXCEPTIONS.—If no method of accounting has been regularly used by the taxpayer, or if the method used does not clearly reflect income, the computation of taxable income shall be made under such method as, in the opinion of the Secretary or his delegate, does clearly reflect income.

(c) PERMISSIBLE METHODS.—Subject to the provisions of subsections (a) and (b), a taxpayer may compute taxable income under any of the following methods of accounting—

    (1) the cash receipts and disbursements method;

    (2) an accrual method;

    (3) any other method permitted by this chapter; or

902

vides that taxable income shall be computed under the method of accounting regularly employed by the taxpayer in keeping his books. Permissible methods enumerated include the cash and accrual methods, any other method permitted by this chapter,[2] or any combination of the foregoing methods permitted under regulations prescribed by the Secretary or his delegate. Subsection (e) requires that a taxpayer secure the consent of the Secretary or his delegate before changing his method of accounting and computing his taxable income under such new method.

Section 1.446–1(e)(2)(i) of the regulations,[3] promulgated by respondent in 1957 under section 446(e), states in part:

A change in the method of accounting includes a change in the over-all method of accounting for gross income or deductions, or a change in the treatment of a material item.

See also section 1.481–1(a)(1) of the regulations[4] promulgated by respondent in 1959 under section 481(a).

Standing alone, the regulatory language "change in the treatment of a material item" might seem to include the disallowance of an item of expense such as we have here. When considered in the overall context of the regulations, the statutes under which they were promul-

---

(4) any combination of the foregoing methods permitted under regulations prescribed by the Secretary or his delegate.

\* \* \* \* \* \* \*

(e) REQUIREMENT RESPECTING CHANGE OF ACCOUNTING METHOD.—Except as otherwise expressly provided in this chapter, a taxpayer who changes the method of accounting on the basis of which he regularly computes his income in keeping his books shall, before computing his taxable income under the new method, secure the consent of the Secretary or his delegate.

[2] For such other methods, see sec. 1.446–1(c)(1)(iii), Income Tax Regs. See also the Dealer Reserve Act of 1960, Pub. L. 86–459, 86th Cong., 2d Sess.

[3] Sec. 1.446–1  General rule for methods of accounting.

(e) *Requirement respecting the adoption or change of accounting method.* \* \* \*

(2)(i) Except as otherwise expressly provided in chapter 1 of the Code and the regulations thereunder, a taxpayer who changes the method of accounting employed in keeping his books shall, before computing his income upon such new method for purposes of taxation, secure the consent of the Commissioner. A change in the method of accounting includes a change in the over-all method of accounting for gross income or deductions, or a change in the treatment of a material item. Consent must be secured whether or not a taxpayer regards the method from which he desires to change to be proper. Thus, a taxpayer may not compute his taxable income under a method of accounting different from that previously used by him unless such consent is secured.

[4] Sec. 1.481–1  Adjustments in general.

(a)(1) Section 481 prescribes the rules to be followed in computing taxable income in cases where the taxable income of the taxpayer is computed under a method of accounting different from that under which the taxable income was previously computed. A change in method of accounting to which section 481 applies includes a change in the over-all method of accounting for gross income or deductions, or a change in the treatment of a material item. For rules relating to changes in methods of accounting, see section 446(e) and paragraph (e) of § 1.446–1. In computing taxable income for the taxable year of the change, there shall be taken into account those adjustments which are determined to be necessary solely by reason of such change in order to prevent amounts from being duplicated or omitted. \* \* \*

gated, and the legislative history, however, I think that the word "treatment" has reference to *treatment accounting-wise* or *method of accounting for*,[5] and that what constitutes a "change in method of accounting" turns upon the materiality of the "change" rather than the materiality of the "item," the treatment of which is changed.[6] When so construed, the mere disallowance of an *item* of expense on the ground that it had not in fact accrued in the taxable year did not constitute a "change in method of accounting" within the meaning of section 481, or the regulations.

This construction of the regulatory language is supported by the legislative history of section 446(e), under which section 1.446-1(e)(2)(i) of the regulations was promulgated. Referring to subsection (e) of section 446, the report of the Senate Committee on Finance (S. Rept. No. 1622, 83d Cong., 2d Sess., p. 300 (1954)) states:

A change in the method of accounting includes a change in the general method of accounting such as a change from the cash receipts and disbursements method to an accrual method, or vice versa, or a change from the cash or an accrual method to the long-term-contract method, or vice versa. It also includes a change in the treatment of a material item such as a change in the method of valuing inventory, or a change from an accrual method without estimating expenses to an accrual method with estimated expenses, or vice versa, or a change in the method of depreciating any property. A change in the method of accounting is a substantial change as distinguished from each change in the treatment of each item. In computing taxable income, a taxpayer who changes his general method of accounting or who treats material items inconsistently must obtain the consent of the Secretary of his delegate unless an express provision of this chapter permits such change at the election of the taxpayer without such consent.

Thus, in equating a "change in the method of valuing inventory" and a "change in the method of depreciating any property" to a "change in the treatment of a material item," the Senate Committee on Finance used the term *"change in treatment"* in the same sense as a *change in method of accounting*. It also stated "A change in the method of accounting is a substantial change as distinguished from each change in the treatment of each item."

I would hold that the disallowance of the deduction for subcontractors' retainage for the taxable year ended in 1961 did not constitute a change in method of accounting and accordingly that section

[5] Respondent apparently concedes as much. On page 29 of his reply brief, he states: "a change in the method of accounting, for the purposes of section 481, refers not only to a change in a regularly employed overall method of accounting but also includes a change in the *method of accounting for* a material item." (Emphasis supplied.)

[6] See Hauser "Recent developments further confuse change of accounting method," **26** J. Taxation 133 (1967).

Incidentally, the "item," the amount of subcontractors' retainage disallowed for the taxable year ended in 1961, was $24,944.14, or 1.8 percent of the total subcontract expense ($1,357,324.86) for that year.

481 is not applicable. In *Walter H. Potter*, 44 T.C. 159, 171 (1965), the taxpayer inconsistently applied the cash receipts and disbursements method of accounting to certain receipts from the sale of houses which resulted in an improper reflection of income. This Court held that "respondent did not change petitioner's method of accounting for the purposes of section 446 but merely corrected certain errors in his method which were resulting in the exclusion from gross receipts of certain amounts which should have been included therein. Consequently, the provisions of section 481 do not apply to respondent's correction of those errors in petitioner's accounting method." In *W. A. Holt Co., Inc.* v. *United States*, 368 F. 2d 311 (1966), the U.S. Court of Appeals for the Fifth Circuit held that the taxpayer's practice of charging off nonworthless accounts was not a "method of accounting" within the meaning of sections 446(c) and 481 dealing with adjustments required by changes in "method of accounting," since the charging off of accounts which were not in fact worthless prevented clear reflection of income as required by the regulations. The court stated: "Here we are concerned only with improper deductions. We hold that there was no change in method of accounting. Thus, the first condition of § 481 was not met."

A contrary result was reached by this Court in *Peoples Bank & Trust Co.*, 50 T.C. 750 (1968), cited in the majority opinion herein. Neither the *Potter* nor the *Holt* case was discussed in that case, nor have they been discussed in the majority opinion herein. In my opinion, the *Peoples Bank & Trust Co.* case, which is presently pending on appeal to the Seventh Circuit, was erroneously decided and should not be followed. In that case the bank employed an accrual method of accounting and filed its returns on a calendar year basis. Interest on savings accounts and certificates of deposit was computed semiannually and credited to the depositors on May 1 and November 1 of each year. Interest on moneys on deposit during November and December was paid only to the extent all or a portion thereof was on deposit on May 1 of the following year. Thus, at the end of its accounting year the bank had not paid or credited to its depositors any interest payments on deposits held through November and December. For each of these months the bank posted an amount to a *reserve* and deducted the 2-month total from income on its returns. In the statement attached to the notice of deficiency respondent stated that no deduction was allowable for amounts claimed as accrued interest expense for the months of November and December since no liability for such interest existed as of December 31 of the taxable year and further stated that this was "a change of accounting method in the treatment of a material item" and that in 1962, the year of change, an adjustment was required to

prevent duplicate deductions for amounts previously deducted in prior years subject to the Internal Revenue Code of 1954. The total of these adjustments was $20,878.77, of which $3,545.26 represented the interest deduction disallowed for the year 1962 and $17,333.51 represented interest erroneously deducted in prior years.

This Court held that the interest expense for the months of November and December of each of the years in issue (1962, 1963, and 1964) was "improperly accrued" and that respondent made a proper adjustment under the provisions of section 481(a)(2), stating:

The term "method of accounting" includes the accounting treatment of any item. Sec. 1.446–1(a)(1), Income Tax Regs. The treatment initiated by respondent was a change in the treatment of a material item, thus constituting a change in petitioner's method of accounting. * * *

To the extent that *Peoples Bank & Trust Co.*, *supra*, holds that the disallowance of the interest expense for 1962 constituted "a change in method of accounting" and that respondent properly increased the Bank's taxable income for 1962 by the amounts of interest expense deducted in the prior years, I would not follow that decision.

The cases cited by respondent, some of which are also cited in the majority opinion, are clearly distinguishable. *Hulond R. Ryan*, 42 T.C. 386 (1964), and *Graff Chevrolet Co.* v. *Campbell*, 343 F. 2d 568 (C.A. 5, 1965), both involved the reporting of dealer reserves as *income*. In both cases the change in method of accounting was initiated by the taxpayer and the basic question was whether the taxpayer was required by section 446(e) to obtain the consent of the Commissioner before making such change. *Wright Contracting Co.*, 36 T.C. 620 (1961), affd. 316 F. 2d 249 (C.A. 5, 1963), certiorari denied 375 U.S. 879, also involved a taxpayer-initiated change in method of accounting for *income*—in that case retainage which had been withheld from a contruction contractor—and there, too, the principal issue was whether the taxpayer was required to obtain the consent of the Commissioner before making the change. *Dorr-Oliver, Inc.*, 40 T.C. 50 (1963), involved a change, initiated by the taxpayer, from a cash to an accrual basis in reporting vacation pay, without first obtaining the consent of the Commissioner. In *Commissioner* v. *O Liquidating Corporation*, 292 F. 2d 225 (C.A. 3, 1961), reversing a Memorandum Opinion of this Court, certiorari denied 368 U.S. 898, the court held that the taxpayer, which for many years had offset from a deduction for employees' group-insurance premiums the estimated accrued dividends which were not paid until the following year, made a change in its accounting method requiring the approval of the Commissioner when it did not include accrued dividends in its return for 1953.

The requirement prescribed by section 446(e) that a taxpayer secure the consent of the Commissioner before making a change in his method of accounting is not an issue in the present case.

*Dearborn Gage Co.*, 48 T.C. 190 (1967), cited in the majority opinion, involved a change in method of valuing inventory, a type of change specifically mentioned in the report of the Senate Committee on Finance quoted above as constituting a change in method of accounting. It is clearly not applicable under the facts of the instant case.

*Oberman Manufacturing Co.*, 47 T.C. 471 (1967), also cited in the majority opinion, is not, in my opinion, controlling upon the question of what constitutes "a change in method of accounting" for the reason that both parties agreed that respondent's determination disallowing a portion of the vacation pay accrued and deducted by the taxpayer in its taxable year ended December 1, 1962, if correct, constituted a change in the taxpayer's method of accounting. Consequently, the first condition of section 481 was not in issue.

Even if it were to be assumed that the disallowance of the deduction for subcontractors' retainage did constitute a change in method of accounting within the meaning of section 481, I am nevertheless of the opinion that respondent erred in including the balance in the subcontractors' retainage account as of the end of the preceding taxable year in petitioner's taxable income for the taxable year ended in 1961. The adjustment in question related only to an *expense deduction* and not the omission or failure to report *income* which might otherwise escape taxation entirely but for the application of section 481. There is no evidence in the present case that petitioner has attempted or will attempt to deduct again as business expenses the subcontractor's retainage deducted in prior years. Limitations alone would bar such a deduction. Moreover, if such a deduction should be claimed, it would not be allowable for the reason that it had already been taken in previous taxable years. As stated in the report of the Senate Finance Committee, *supra* at page 307:

If there is a change in the method of accounting employed in computing taxable income from the method employed for the preceding taxable year, adjustments must be made in order that every item of gross income or deduction is taken into account and that none are omitted. At the same time *no item is to affect the computation of taxable income more than once.* It is only those omissions or doubling ups which are due to the change in method which must be adjusted. [Emphasis supplied.]

The inclusion of $101,869.35, the balance in the subcontractor's retainage account as of the end of the preceding taxable year, in petitioner's income for the taxable year ended in 1961 is clearly not

"necessary" "in order to prevent amounts from being duplicated or omitted." Consequently, section 481 is not applicable.

I would deny the adjustment made by respondent under the provisions of section 481.

